ACCEPTED
15-25-00082-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
6/25/2025 5:05 PM
CHRISTOPHER A. PRINE
CLERK

No. 15-25-00082-CV

# In the Court of Appeals
# for the Fifteenth Judicial District
# Austin, Texas

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
6/25/2025 5:05:07 PM
CHRISTOPHER A. PRINE
Clerk

STATE OF TEXAS,

*Appellant*,

*v.*

ARITY 875, LLC,

*Appellee.*

On Appeal from the 457th Judicial District Court, Montgomery County

## BRIEF FOR APPELLANT

*Counsel for Appellant*

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for
Civil Litigation

JOHNATHAN STONE
Chief, Consumer Protection Division

RICK BERLIN
Assistant Attorney General
State Bar No. 24055161
Rick.Berlin@oag.texas.gov

Office of the Attorney General
Consumer Protection Division
808 Travis Street Suite 1520
Houston, Texas 75251
Tel: (800) 621-0508

ORAL ARGUMENT REQUESTED

# IDENTITY OF PARTIES AND COUNSEL

**Appellant:**

State of Texas

**Appellate and Trial Counsel:**

Rick Berlin
Assistant Attorney General
State Bar No. 24055161
Rick.Berlin@oag.texas.gov

Kaylie Buettner
Assistant Attorney General
State Bar No. 24109082
Kaylie.Buettner@oag.texas.gov

Richard McCutcheon
Assistant Attorney General
State Bar No. 24139547
Richard.McCutcheon@oag.texas.gov

Office of the Attorney General of Texas
Consumer Protection Division
808 Travis St., Suite 1520
Houston, Texas 77002

**Appellee:**

Arity 875, LLC

**Appellate and Trial Counsel:**

W. Reid Wittliff
State Bar No. 00791951
WITTLIFF CUTTER PLLC
510 Baylor St.
Austin, Texas 78703
Telephone: (512) 960-4866
Facsimile: (512) 960-4869
Email: reid@wittliffcutter.com

Jake Sommer
Kelsey Harclerode

2

ZWILLGEN PLLC
1900 M Street NW, Suite 250
Washington, D.C. 20036
Telephone: (202) 296-3585
Email: jake@zwillgen.com
kelsey@zwillgen.com

Sudhir V. Rao
ZWILLGEN PLLC
183 Madison Ave., Suite 1504
New York, NY 10016
Telephone: (646) 362-5590
Email: sudhir.rao@zwillgen.com

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ............................................................ 2

INDEX OF AUTHORITIES .............................................................................. 6

RECORD REFERENCES ................................................................................ 10

STATEMENT OF THE CASE ......................................................................... 10

STATEMENT OF JURISDICTION ................................................................... 10

STATEMENT REGARDING ORAL ARGUMENT ............................................. 11

ISSUE PRESENTED ..................................................................................... 11

INTRODUCTION ......................................................................................... 12

STATEMENT OF FACTS .............................................................................. 13

    I.    ARITY 875 COLLECTS DRIVING DATA ON OVER THREE MILLION
        TEXANS WITHOUT CONSENT. ..........................................................13

        A.    Arity 875 Contracts with App Developers to Install the Arity
               SDK on User Devices. ................................................................. 14

        B.    App Users Unwittingly Send Their Sensitive Driving Data to
               Arity 875. .................................................................................16

        C.    Arity 875 Transmits Texans' Sensitive Data to Allstate and
               Other Insurers Without Informed Consent. ...................................17

    II.    PROCEDURAL HISTORY ................................................................... 20

        A.    The State Files Suit Against Arity 875. ......................................... 20

        B.    Arity Challenges Personal Jurisdiction. ........................................ 22

SUMMARY OF THE ARGUMENT ................................................................... 24

STANDARD OF REVIEW .............................................................................. 25

ARGUMENT ............................................................................................... 27

    I.    TEXAS HAS SPECIFIC JURISDICTION OVER ARITY 875. .............................. 27

        A.    Arity 875 Purposefully Availed Itself of Texas' Jurisdiction by
               Doing Business in Texas. ............................................................ 27

             1.    Arity 875 controls the distribution of its product by contracting
                   with companies to provide services to Texans and collect data in
                   Texas. ................................................................................ 29

             2.    Arity 875 made purposeful, continuous contact with Texans by
                   harvesting and selling their data. ............................................. 33

          *i.*   *Arity 875's data collection scheme purposefully availed it of Texas' jurisdiction.* ............................................................... *34*

          *ii.*  *Arity 875's jurisdictional contest lacks merit.* ............................. *37*

      3.  Arity 875 availed itself of Texas by deliberately targeting Texans for marketing. ................................................................. 39

   B.  Arity 875's Contacts Are "Substantially Related" to the State's Claims. ................................................................. 41

  II.  TEXAS JURISDICTION DOES NOT OFFEND TRADITIONAL NOTIONS OF FAIR PLAY AND SUBSTANTIAL JUSTICE. ............................................... 45

PRAYER ............................................................................................... 49

CERTIFICATE OF COMPLIANCE ............................................................ 50

# INDEX OF AUTHORITIES

**CASES**

*Asahi Metal Indus. Co. v. Superior Ct. of Cal.*,
   480 U.S. 102 (1987)................................................................................28

*BMC Software Belgium, N.V. v. Marchand*,
   83 S.W.3d 789 (Tex. 2002) ................................................................ 25, 26

*Bristol-Myers Squibb Co. v. Sup. Ct. of California, San Francisco Cnty.*,
   582 U.S. 255 (2017)................................................................................41

*BRP-Rotax GmbH & Co. KG v. Shaik*,
   No. 23–0756, slip op. at 18 (Tex. 2025)................................................37

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985)................................................................................29

*Facebook, Inc. v. Doe*,
   650 S.W.3d 748 (Tex. App.—Houston [14th Dist.] 2022, pet. denied).......39, 40

*Ford Motor Co. v. Montana Eighth Judicial Dist. Court*,
   592 U.S. 351 (2021)................................................................................28

*Google LLC v. State*,
   No. 13-23-00114-CV, 2025 WL 52611 (Tex. App.—Corpus Christi–Edinburg
   Jan. 9, 2025) ................................................................................ 43, 44

*Guardian Royal Exch. Assur., Ltd. v. English China Clays, P.L.C.*,
   815 S.W.2d 223 (Tex. 1991) ....................................................... 45, 46, 48

*International Shoe Co. v. Washington*,
   326 U.S. 310 (1945) ................................................................................26

*Luciano v. SprayFoamPolymers.com, LLC*,

    625 S.W.3d 1 (Tex. 2021) ...................................................................... 26, 28

*Mavrix Photo, Inc. v. Brand Technologies, Inc.*,

    647 F.3d 1218 (9th Cir. 2011) ................................................................ 40

*McGee v. International Life Ins. Co.*,

    355 U.S. 220 (1957) ........................................................................... 30, 48

*MDSave, Inc. v. Sesame Inc.*,

    No. 6:21-CV-01338-ADA, 2023 WL 353998 (W.D. Tex. 2023).......................... 34

*Michiana Easy Livin' Country, Inc. v. Holten*,

    168 S.W.3d 777 (Tex. 2005) ........................................................... 29, 30

*Micromedia v. Automated Broadcast Controls*,

    799 F.2d 230 (5th Cir. 1986) ................................................................ 30

*Moki Mac River Expeditions v. Drugg*,

    221 S.W.3d 569 (Tex. 2007)............................................. 28, 39, 41, 47

*Moncrief Oil Intern. Inc. v. OAO Gazprom*,

    414 S.W.3d 142 (Tex. 2013) ...................................................... passim

*Old Republic Nat'l Title Ins. v. Bell*,

    549 S.W.3d 550 (Tex. 2018)................................................................ 25

*Searcy*,

    496 S.W.3d at 68–69 ..................................................................... 43, 44

*Spir Star v. Kimich*,

    310 S.W.3d 868 (Tex. 2010)................................................... 46, 48, 49

*State v. Volkswagen Aktiengesellschaft,*

    669 S.W.3d 399 (Tex. 2023).............................................................. passim

*TravelJungle v. American Airlines, Inc.,*

    212 S.W.3d 841 (Tex. App.—Fort Worth 2006, no pet.) .............................37, 38

*U-Anchor Adver., Inc. v. Burt,*

    553 S.W.2d 760 (Tex. 1977) ................................................................ 25

*UMG Recordings, Inc. v. Kurbanov,*

    963 F.3d 344 (4th Cir. 2020)............................................................... 40

*Winnsboro Auto Ventures, LLC v. Santander Consumer USA, Inc.,*

    No. 05-17-00895-CV, 2018 WL 1870771 (Tex. App.—Dallas, Apr. 19, 2018, no

    pet.).......................................................................................... 47, 49

**STATUTES**

Tex. Bus. & Com. Code § 509.005 ...................................................... 21, 22

Tex. Bus. & Com. Code § 541.101(b)(4) ................................................... 21

Tex. Bus. & Com. Code § 541.102(a)(1) ................................................... 21

Tex. Bus. & Com. Code § 541.102(a)(3) ................................................... 21

Tex. Bus. & Com. Code § 541.102(b) ...................................................... 21

Tex. Bus. & Com. Code § 541.103 ......................................................... 21

Tex. Civ. Prac. & Rem. Code § 17.042 .................................................... 25

Tex. Ins. Code § 541.001................................................................... 22

Tex. Ins. Code § 541.003 .................................................................. 22

Texas Civil Practice and Remedies Code Section 51.014(a)(7) ........................... 10

Texas Government Code Section 22.220(d)(1) ...................................................... 10

# RECORD REFERENCES

"Am. C.R." refers to the one-volume amended clerk's record.

# STATEMENT OF THE CASE

Nature of the Case:   This is a case brought against Arity 875, LLC for violations of the Texas Data Privacy and Security Act ("TDPSA"), the Texas Data Broker Act, and the Texas Insurance Code.

Trial Court:   457th District Court, Montgomery County
The Honorable Vince Santini

Course of Proceedings:   This is an appeal after the trial court granted Defendant Arity 875, LLC's special appearance.

Disposition in the Trial Court:   The district court rendered an order granting Arity 875, LLC's special appearance.

# STATEMENT OF JURISDICTION

The Court has jurisdiction under Texas Civil Practice and Remedies Code Section 51.014(a)(7) and Texas Government Code Section 22.220(d)(1).

## STATEMENT REGARDING ORAL ARGUMENT

This appeal presents matters of first impression, including whether the Texas Data Privacy and Security Act and Texas Data Broker Act can hold liable foreign entities for in-state data collection and advertising targeted to Texas residents. Oral argument would aid the court's resolution of the case.

## ISSUE PRESENTED

The issue presented is as follows:

1. Whether Arity 875, LLC purposefully availed itself of the Texas forum and the State's claims are related to those purposeful contacts with Texas, establishing personal jurisdiction?

# INTRODUCTION

Arity 875, LLC ("Arity 875"), a "mobile telematics" company owned by The Allstate Corporation, secretly and illicitly collects the sensitive data of millions of Texans from their mobile devices without their knowledge or consent. Through contracts with third-party mobile app developers, including Texas-based developers GasBuddy and Fuel Rewards, Arity 875 arranges for its proprietary software, known as the Arity SDK, to be installed as a component of the third-party app. Once installed, the Arity SDK uses the devices' hardware and software to monitor and collect location data from the Texas users' phones, generate targeted advertisements to Texas users, and then pipeline the collected user data out of Texas to its co-defendants (collectively, "Defendants"). Defendants then compile and analyze the ill-gotten data to inform their own automobile insurance decisions in Texas and to sell to other insurers.

Arity 875's actions made it subject to Texas' jurisdiction. *See State v. Volkswagen Aktiengesellschaft*, 669 S.W.3d 399 (Tex. 2023). Because Arity 875 dropped the Arity SDK "down a chute guaranteed it would land in Texas," Texas possesses specific personal jurisdiction over Arity 875. *Id.* at 432. The Arity SDK landed on over three million Texas devices and actively collects data from them every fifteen seconds.

Even if *Volkswagen* alone does not compel finding specific personal jurisdiction, the record contains numerous examples of why Arity 875 should be subject to Texas' jurisdiction. Namely, Arity 875 contracted with Texas entities to collect Texans' data, installed its software on Texans' hardware, collected data from Texas devices, and targeted Texas consumers for advertising. Each contact independently or taken in their totality renders Arity 875 subject to Texas' jurisdiction.

Despite its conduct directed at Texas and Texans, Arity 875 seeks to avoid appearing to answer for its actions in Texas. Arity 875 is subject to personal jurisdiction in Texas. This Court should reverse.

## STATEMENT OF FACTS

### I. ARITY 875 COLLECTS DRIVING DATA ON OVER THREE MILLION TEXANS WITHOUT CONSENT.

Arity 875 collects and analyzes sensitive data from Texans without their knowledge or consent through software Arity 875 embeds in popular third-party mobile applications ("apps") used by millions of Texans every day. Am. C.R. at 206, ¶ 2; 211, ¶ 23 ("Arity 875, LLC is a mobility data and analytics company…"). Incorporated in Delaware and headquartered in Illinois, Arity 875 provides nationwide "mobility data and analytics" services, including in Texas. Am. C.R. at 221, ¶ 23; Am. C.R. at 82, ¶¶ 8, 12; 81, ¶ 12 ("[Arity 875's] services are equally

13

available in Texas as they are in other States."). But notably, Arity 875 advertises itself as a "fully remote" company and lists a Dallas PO box as its contact point for any inquiries concerning its privacy practices. Am. C.R. at 212, ¶ 23.

Arity 875's seemingly benign description of its activities obscures the true nature of Arity 875's role in an elaborate multi-company scheme to secretly take Texas consumers' data for use by other Allstate-branded companies ("Allstate") to manipulate their car insurance rates or sell it to other insurance companies doing the same. *See* A.M. C.R. at 222. At least three million Texans had their data taken by Arity 875 through this method. Am. C.R. at 214, ¶ 31.

## A. Arity 875 Contracts with App Developers to Install the Arity SDK on User Devices.

Arity 875 is the first link in the chain of companies owned by insurance giant, The Allstate Corporation, participating in a scheme to harvest and monetize millions of Texans' data for profit. Am. C.R. at 206, ¶ 2. Arity 875's role involved obtaining Texas consumers' data by contracting to install the Arity SDK into third-party mobile applications. Am. C.R. at 206–208. Software development kits, also known as "SDKs," are generally a set of preprogrammed features meant for an app developer to easily integrate into an existing application to power certain functions. Am. C.R. at 215, ¶ 34.

Since at least 2017, Arity 875 contracted with mobile phone app development companies to integrate the Arity SDK into at least seven existing mobile apps, including, but not limited to: Life360, GasBuddy, and Fuel Rewards. Am. C.R. at 216, ¶ 38. While the Arity SDK performed a litany of functions within the apps, its two most relevant features here are: (1) collecting detailed location data from the mobile phone; and (2) targeting the advertising of insurance products based on the specific mobile phone user. Am. C.R. at 215, 218. The Arity SDK collects from and advertises to millions of Texas consumers. Am. C.R. at 214, 217.

As an incentive to install the Arity SDK third-party apps, Arity 875 paid the app developers millions of dollars and powered certain legitimate functions on the apps, including crash detection and "safety features." Am. C.R. at 207, ¶ 5; Am. C.R. at 90, ¶ 8; *see also* Am. C.R. at 81, ¶ 8. In return, the mobile app developers gave Arity 875 the right to collect data from the apps' users and ownership rights in the underlying data as well as granting Arity 875 a license on identifying information that allowed Arity 875 to connect a user's name to the location data.[1] Am. C.R. at 216–217, ¶¶ 40–42.

---

[1] Arity 875 licensed the following data from the mobile app developers: app user's first and last name, phone number, zip code, number of vehicles associated with their account, device ID, and mobile ad-ID.

Two such developers include Excentus Corporation, a Texas corporation that operates the app Fuel Rewards, and GasBuddy, a Delaware company that owns the app of the same name. Am. C.R. at 216. Both are headquartered in Dallas, Texas. Am. C.R. at 216. Given that both operated in Texas, Arity 875 knew either actually or constructively that Fuel Rewards and GasBuddy had Texas users. *See* Am. C.R. at 216. Further, since Texas is Allstate's top market, Arity 875 had significant incentive to contract with companies who could supply information about Texas individuals. *See* Am. C.R. at 206.

### B. App Users Unwittingly Send Their Sensitive Driving Data to Arity 875.

Once a consumer downloads any of the mobile apps Arity 875 contracted with, the consumer unwittingly also downloads the Arity SDK as a component of that app. Am. C.R. at 206–207. If the consumer enables geolocation features on the app, the consumer also unknowingly activates the Arity SDK. *See* Am. C.R. at 206–207. After activation, the Arity SDK automatically collects the consumer's location and movement in real-time, pipelines that data from the consumer's phone to Arity 875, and serves advertisements to the consumer from within the mobile app based on the user's activities. Am. C.R. at 206–207.

The Arity SDK pulls highly sensitive data from the apps' Texas users thousands of times a day. The data includes where they drive, when they drive, how

long they drive, how fast they drive, and multiple other data-points throughout the day—all-day, every day. Am. C.R. at 207, ¶ 5; Am. C.R. at 58 ("The SDK collects data through the apps about the user's phone handling, driving, speeding, and braking.") (citing Am. C.R. at 82, ¶ 9).[2] Every fifteen seconds, Arity 875 makes another contact with every Texas user of any mobile app with the Arity SDK installed. Am. C.R. at 207. Every fifteen seconds, the Arity SDK collects the geolocation, trip attribute data, movement data, "dwell time," user metadata, and many other data points of over three million phones in Texas. Am. C.R. at 207.

## C. Arity 875 Transmits Texans' Sensitive Data to Allstate and Other Insurers Without Informed Consent.

Once Arity 875 collects this data, it transfers it to be further analyzed and used by Allstate, either for eventual use in Allstate's car insurance business or for sale to other insurers. Am. C.R. at 207, ¶ 6. Arity 875 and its co-defendants compile and

---

[2] Types of data that the Arity SDK monitored included:
- the mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;
- "Trip attributes," which included information about a consumer's movements, such as start and end location, distance, duration, start and end time, and termination reason code;
- "GPS points," such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer's mobile phone;
- "Derived events," such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end location, start and end time, speed attribute, rate of change attribute, and signal strength attribute; and
- Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, device type, app version, and OS version.

Am. C.R. at 215–16.

analyze this ill-gotten data to evaluate consumers' driving behavior. Am. C.R. at 214, ¶ 31–32. Using the data, Arity and its co-defendants built the world's "largest driving behavior database." Am. C.R. at 214, ¶ 31–32. By Defendants' own admission, the database houses the driving behavior data of over forty-five million Americans. Am. C.R. at 206. The database includes at least three million Texans. *See* Am. C.R. at 214, ¶ 31.

Arity 875 and its co-defendants enacted the scheme for two primary purposes. Am. C.R. at 206 ¶ 2. First, Arity 875 transferred the data it collected from Texas users to Allstate's insurance business so it could "more accurately" price insurance to Texas consumers. *See* Am. C.R. at 206. Second, Arity 875 and its co-defendants profited by selling the driving behavior data Arity 875 collected to third parties, including other insurers for use in pricing Texas insurance policies. Am. C.R. at 206.

Arity 875's actions were specifically intended to benefit Allstate's rate-making abilities in the Texas market. Am. C.R. at 206. As Allstate's top market, Allstate derives more revenue from Texas than any other state. Am. C.R. at 206 ¶ 1. However, because Texas is a "high-risk" market, Allstate sought a method to identify and "accurately" price "dangerous" drivers when compared to "safe" drivers. Am. C.R. at 206. In other words, Allstate wanted to identify and increase

prices on "risky" drivers as well as entice "safe" drivers by lowering their rates. *See* Am. C.R. at 206.

Arity 875 provided the solution to Allstate's "high-risk" issue. *See* Am. C.R. at 206. By secretly and illicitly collecting Texans' data, Arity 875 enabled Allstate to analyze and use that data to make pricing decisions on a driver's insurability based on that driver's behavior instead of through traditional means. *See* Am. C.R. at 206. Using the Arity SDK, Allstate could also target desirable drivers through mobile advertising. *See* Am. C.R. at 206; 217–18, ¶ 43. Defendants further profited by selling Texans' data to other insurers seeking to gain the same advantage. Am. C.R. at 206; 217–18, ¶ 43.

At no point while using the mobile apps, were Texas consumers meaningfully informed that Arity 875 would be taking their driving behavior data for use in determining their insurance rates. Am. C.R. at 206, ¶ 2. To the extent any app disclosed Arity 875's existence at all, neither Arity 875 nor associated mobile apps alerted consumers that Arity 875 collected that data for use in personalized insurance rates based on their driving behavior. Am. C.R. at 220–222. Even if a Texas consumer read the fine print in the select few apps that noted Arity 875's existence, determined Arity 875 had a data-sharing relationship with the mobile app, and

tracked down Arity 875's privacy policy, Arity 875's privacy policy does not meaningfully disclose its data practices. Am. C.R. at 220–222.

In short, Arity 875 secretly installed its software on Texas consumers' mobile phones to collect data on Texans' driving habits and advertise insurance products to Texans. Am. C.R. at 206, ¶ 2. Arity 875 took that data from Texans' devices and pipelined it to its co-defendants to be used in writing automobile insurance policies. Am. C.R. at 206, ¶ 2. Because the Arity SDK operates in the background on third-party apps that have no obvious relationship to insurers, the Texas users of the apps were none the wiser. Am. C.R. at 216, ¶ 37.

## II. PROCEDURAL HISTORY

### A. The State Files Suit Against Arity 875.

On January 13, 2025, the State filed the instant lawsuit against Arity 875 and its co-defendants. Am. C.R. at 1. The State alleges that Arity 875 and the Arity-affiliated defendants violated the Texas Data Privacy and Security Act ("TDPSA"), the Texas Data Broker Act ("DBA"), and the Texas Insurance Code. Arity 875 violated the aforementioned acts by unlawfully collecting Texas consumers' data via the Arity SDK without consent or proper notice, then transferring and/or selling that data for eventual use in automobile insurance policy writing. Am. C.R. at 223–32.

20

Arity 875 violated the Texas Data Privacy and Security Act in five ways. Am. C.R. 223–229. First, Arity 875 failed to provide consumers with a "reasonably accessible and clear privacy notice" that includes "any sensitive data processed by the controller." Am. C.R. at 224–25, ¶¶ 63–66; Tex. Bus. & Com. Code § 541.102(a)(1). Second, Arity 875 processed "sensitive data" without obtaining consumers' consent. Am. C.R. at 225–26, ¶¶ 67–70; Tex. Bus. & Com. Code § 541.101(b)(4). Third, Arity 875 failed to provide the required notice that it sold sensitive data. Am. C.R. at 226–227, ¶¶ 71–75; Tex. Bus. & Com. Code § 541.102(b). Fourth, Arity 875 failed to provide the required disclosures concerning the sale of personal data to third parties, processing of personal data for targeted advertising, and a method to opt out of either. Am. C.R. at 227–28, ¶¶ 76–78; Tex. Bus. & Com. Code § 541.103. Finally, Arity 875 failed to provide a reasonably clear privacy notice indicating how a consumer may exercise his or her rights under the TDPSA. Am. C.R. at 228–29, ¶¶ 79–85; Tex. Bus. & Com. Code § 541.102(a)(3).

The State additionally alleges that Arity 875 violated the Data Broker Act by failing to register as a data broker. Am. C.R. at 230–31; Tex. Bus. & Com. Code § 509.005. Arity 875 acts as a data broker by deriving revenue from the identifying information that it licenses from apps meant to identify the individual who the Arity SDK collects geolocation data on. Am. C.R. at 230, ¶ 88. Because Arity 875 does not

21

directly collect the identifying information meant to be paired with the Arity SDK data, Arity 875 acts as a data broker. *Id.* Despite being noticed by the State to register, Arity 875 refuses to do so.

Finally, Arity 875 violated the Texas Insurance Code by engaging in unfair and deceptive acts to collect Texans' data. Am. C.R. at 231–32; Tex. Ins. Code § 541.001. Such acts included "failing to verify" consumers' consent before purchasing driving-related data from vehicle manufacturers and "turning a blind eye to the strong possibility that consumers did not consent to [the] collection and sale" of their sensitive and/or non-anonymized data to Insurers. Am. C.R. at 231–32; Tex. Ins. Code § 541.003.

## B. Arity Challenges Personal Jurisdiction.

Arity 875 filed its Motion for Special Appearance arguing that it was not subject to personal jurisdiction in Texas because the State did not sustain its pleading burden, Arity 875 was only subject to personal jurisdiction in Illinois, and Arity 875 did not "purposefully avail" itself of Texas' jurisdiction. Am. C.R. at 56–83. Arity 875 further argued that its alleged Texas contacts did not substantially relate to the State's claims and that exercising jurisdiction in Texas would offend traditional notions of fair play and substantial justice. Am. C.R. at 56–83.

22

The State opposed, arguing that Arity 875 subjected itself to specific personal jurisdiction in Texas by installing the Arity SDK on Texas mobile devices, contracting with Texas entities to install the Arity SDK on mobile devices, and marketing to Texas consumers using the Arity SDK. Am. C.R. at 240–56. The State explained that having alleged those facts, the State met its pleading burden, demonstrated purposeful availment, established Arity 875's contacts were substantially related to the State's claims, and fair play and substantial justice would not be offended by the exercise of Texas' jurisdiction. Am. C.R. at 240–56.

In the alternative, the State requested a continuance of the hearing to conclude outstanding jurisdictional discovery, which it had sent prior to the hearing. Am. C.R. at 256. The State's discovery included interrogatories, requests for admission, and requests for production. Am. C.R. at 156–170, 184–198. The State further responded by amending its petition. Am. C.R. at 205–239.

On April 11, 2025, the district court granted Arity 875's Special Appearance and dismissed the case without comment. Am. C.R. at 415.

## SUMMARY OF THE ARGUMENT

Arity 875 has "minimum contacts" sufficient to grant Texas specific personal jurisdiction. Arity 875 maintains at least three broad categories of "minimum contacts" with Texas, each independently sufficient for Texas to exercise jurisdiction: (1) its focus on Texas through its contracts with Texas-based companies; (2) its installation of the Arity SDK on Texas devices and subsequent data collection from Texas devices; and (3) its targeted advertising to Texas consumers. Each contact substantially relates to the State's claims because Arity 875's illegal collection of Texans' data forms one of the primary bases of the States' case. This is more than sufficient for personal jurisdiction under *State v. Volkswagen Aktiengesellschaft*, 669 S.W.3d 399 (Tex. 2023).

Further, exercising jurisdiction over Arity 875 would be consistent with traditional notions of fair play and substantial justice, especially because Texas has an exceptionally powerful interest in adjudicating violations of its regulatory scheme in its own state courts. The district court erred in concluding that Texas did not have personal jurisdiction over Arity 875. This Court should reverse the district court's order and remand for further proceedings on the merits.

## STANDARD OF REVIEW

Whether a court can exercise personal jurisdiction over a nonresident defendant is a question of law that is reviewed de novo. *Volkswagen,* 669 S.W.3d at 413; *Old Republic Nat'l Title Ins. v. Bell,* 549 S.W.3d 550, 558 (Tex. 2018). A Texas court "may assert personal jurisdiction over a nonresident defendant if (1) the Texas long-arm statute so provides and (2) the exercise of jurisdiction 'is consistent with federal and state due process guarantees.'" *Volkswagen,* 669 S.W.3d at 412.

The broad language of the Texas long-arm statute "permits Texas courts to exercise jurisdiction over a nonresident defendant that 'does business' in Texas" and "extends Texas courts' personal jurisdiction 'as far as the federal constitutional requirements of due process will permit.'" *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002) (quoting *U-Anchor Adver., Inc. v. Burt*, 553 S.W.2d 760, 762 (Tex. 1977). "Doing business" under Texas law can mean either (1) contracting with a Texas resident and performing the contract in whole or in part in Texas; or (2) committing a tort in whole or in part in Texas. Tex. Civ. Prac. & Rem. Code § 17.042.

"Personal jurisdiction over nonresident defendants is constitutional when two conditions are met: (1) the defendant has established minimum contacts with the forum state, and (2) the exercise of jurisdiction comports with traditional notions of

fair play and substantial justice." *BMC Software*, 83 S.W.3d at 795 (Tex. 2002) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). These minimum contacts can give rise to either specific or general personal jurisdiction. *Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 8 (Tex. 2021). Specific jurisdiction arises "when (1) the defendant engages in 'some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum [s]tate' and (2) the plaintiff's claims 'arise out of or relate to' those forum contacts." *Volkswagen,* 669 S.W.3d at 412–413. Once the plaintiff has pled allegations sufficient to demonstrate jurisdiction, the "burden then shifts to the defendant to negate all bases of jurisdiction in the allegations." *Luciano*, 625 S.W.3d at 8.

# ARGUMENT

## I. TEXAS HAS SPECIFIC JURISDICTION OVER ARITY 875.

Arity 875 purposefully availed itself of the privilege of doing business in Texas by intentionally targeting Texas consumers for data collection and advertising. Arity 875 uses its software (Arity SDK) to repeatedly contact Texans' devices, collect information about them, target advertising towards them, and sell that information to Texas insurers, all while claiming they have no minimum contacts with Texas. Arity 875's collection of information, without providing notice, obtaining consent, or registering to do business as a data broker, forms the basis for the State of Texas' claims.

### A. Arity 875 Purposefully Availed Itself of Texas' Jurisdiction by Doing Business in Texas.

Arity 875 availed itself of the Texas market by contracting with mobile phone application developers to distribute Arity 875's software—the Arity SDK—into Texas to surreptitiously collect driving behavior from Texas users for profit. To determine whether a non-resident defendant "purposefully availed" itself of Texas' jurisdiction, courts look to 1) the defendant's relevant contacts with the forum State, 2) whether the contacts are purposeful, and 3) whether the defendant seeks "some benefit, advantage, or profit." *Volkswagen,* 669 S.W.3d at 413–414 (quoting *Moncrief Oil Intern. Inc. v. OAO Gazprom*, 414 S.W.3d 142, 151 (Tex. 2013).

Texas courts also use a "stream-of-commerce plus" theory to assist in analyzing these contacts when an out of state business places its product into the stream of commerce and then engages in additional conduct "evincing 'an intent or purpose to serve the market in the forum State,' whether directly or indirectly." *Luciano*, 625 S.W.3d at 10 (quoting *Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. 102, 112 (1987)). Therefore, when a business "serves a market for a product in a State and that product causes injury in the State to one of its residents, the State's courts may entertain the resulting suit." *Ford Motor Co. v. Montana Eighth Judicial Dist. Court*, 592 U.S. 351, 355 (2021). Some examples of conduct courts have considered as "[e]vidence of such additional conduct may include advertising in the forum state . . .or creating, controlling, or employing the distribution system that brought the product into the forum state." *Luciano*, 625 S.W.3d at 10 (citations omitted).

Arity 875's conduct in Texas satisfies all these factors because Arity 875 purposefully places its product—the Arity SDK—into the stream of commerce "with the expectation that they will be sold in the forum state." *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 577 (Tex. 2007). Arity 875 manifested its intent to serve the Texas market in three different ways. First, Arity 875 targeted Texas by contracting with Texas companies, among others, to collect data, supply

services and send targeted advertising to users in Texas. Second, Arity 875 availed itself by collecting data directly from devices in Texas. Third, Arity 875 targeted Texans for advertising on mobile apps using the Arity SDK. Each provides an independent basis for Texas to exercise personal jurisdiction.

1. **Arity 875 controls the distribution of its product by contracting with companies to provide services to Texans and collect data in Texas.**

Arity 875's contracts with mobile app companies, including Texas-based companies, to monitor and harvest data from Texas devices are sufficient for purposeful availment. Even a single contract may be sufficient to meet the purposeful availment standard, especially when that contract involves a series of contacts over long periods of time. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 788 (Tex. 2005) (analyzing the difference between a single contract with a single contact compared to a single contract requiring multiple contacts). Factors relevant to whether contracts can create grounds for personal jurisdiction include "prior negotiations," "contemplated future consequences," "terms of the contract," and "the parties' actual course of dealings." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479 (1985). Arity 875 contracts with companies, including Texas companies, to install the Arity SDK, provide services for their apps, collect data and provided bonuses to incentivize the companies to expand their data set. Am. C.R. at 206–207.

The Texas Supreme Court has explained a "single contract may meet the purposeful-availment standard" if it involves more than a "single contact taking place outside the forum state." *Michiana*, 168 S.W.3d at 787; *see also Micromedia v. Automated Broadcast Controls*, 799 F.2d 230, 234 (5th Cir. 1986) ("Even a single purposeful contact may be sufficient to meet the requirements of minimum contacts when the cause of action arises from the contact.") (citing *McGee v. International Life Ins. Co.*, 355 U.S. 220 (1957)). The Court further stated that the types of such agreements include "long-term franchise agreement[s] . . . because, though it stems from a single contract, it involves many contacts over a long period of time," and "life-insurance polic[ies] [which] stem from a single contract, but necessarily involve[] a series of contacts until death does the parties part." *Michiana*, 168 S.W.3d at 787.

Arity 875 satisfies all these criteria. Arity 875 entered into agreements with Texas-based companies Excentus Corporation and GasBuddy LLC (as well as others) that required Arity 875 to have *many* contacts with Texas over the course of several years. Specifically, Arity 875 entered into years-long agreements to install the Arity SDK, expand the apps' user base, perform services on the apps, advertise to app users, and continually collect Texans' user data from Texas devices. As part of

30

these agreements, Arity 875 made regular monthly payments to both companies. These contacts are more than sufficient to establish purposeful availment.

Further, the Texas Supreme Court in *Volkswagen* established that not only can contracts themselves constitute contact with Texas, but also the actions of the companies directed by those contracts to act in Texas. 669 S.W.3d at 414. These contacts can be attributed regardless of whether the contracted companies are brought into the lawsuit. *Id.*

The facts in *Volkswagen* establishing purposeful availment are strikingly similar to Arity 875's conduct. 669 S.W.3d 399 (finding specific jurisdiction in Texas for nationwide software updates). *Volkswagen* concerned the German vehicle manufacturer Volkswagen (VW Germany), a foreign entity, releasing nationwide vehicle software updates meant to conceal that their vehicles failed to meet U.S. emissions standards. *Id.* at 409. The court found that VW Germany developed the tampering software, used its contract authority to install the software, knew the vehicles were located in Texas, knew the local dealerships would receive the software, and supplied and approved the messaging about the software. *Id.* at 414-415. As a result, the court found that:

> the process was essentially put into unstoppable motion by the manufacturers and did not derive from unilateral or independent action of VW America, the dealerships, or their customers. By directing an affiliated importer/distributor to carry out the recall and service

31

campaigns—knowing the importer/distributor and the local dealerships were contractually obligated to do so when, as, and how instructed—the German manufacturers purposefully availed themselves of the Texas market to consummate their illegal scheme.

*Volkswagen*, 669 S.W.3d at 415–16.

Similarly, Arity 875 developed the Arity SDK, used its contractual authority with the app developers to install the software, knew the users' phones were in Texas and that those phones did in fact receive the tracking software, and supplied and approved the consent terms at issue in this case. Am. C.R. 206–08. Arity 875's contract partners, the third-party app developers, act as "a mere conduit for passing the manufacturers' software" through to the Texas users' phones. *Volkswagen*, 669 S.W.3d at 415.

Further, Arity 875 knew its conduct would affect the privacy rights of Texas individuals. Arity 875 represents to the public, on *their own website*, that if they have questions or concerns about their data privacy, such as the data collection at issue, they should contact Arity in Dallas, Texas.

## Contact us

If you should have questions or concerns about our privacy practices, please contact us through the below methods.

Please note: When sending inquiries to us, we may need additional information such as the business client you have engaged for which we collected data to better assist you.

**For users in the U.S. and other users (outside of Switzerland, the UK, European Union, and EEA):**

Email: **privacy@arity.com**

Mail: Arity
Attn: Data Protection Officer
PO Box 227238
Dallas, TX 75222-7238
United States of America

*See* Arity Privacy Statement, https://arity.com/privacy/ (last visited June 25, 2025)("This Privacy Statement describes the privacy practices of Arity, LLC and Arity 875, LLC ("Arity", "we" or "us")."); Am. C.R. 212, ¶ 23; Am. C.R. at 244.

Accordingly, this Court should find that Arity 875 purposefully availed itself of Texas.

### 2. Arity 875 made purposeful, continuous contact with Texans by harvesting and selling their data.

Arity 875 created Texas contacts by installing the Arity SDK on millions of Texas mobile devices, providing services to those devices, and collecting data from those devices. Using the Arity SDK, Arity 875 reached from Illinois into Texas,

33

seeking the benefit of collecting, analyzing, and then selling Texans' data. *See Volkswagen*, 669 S.W.3d at 413–14 (requiring defendants have purposeful contacts with the forum that seek some benefit, advantage, or profit to exercise personal jurisdiction); *MDSave, Inc. v. Sesame Inc.,* No. 6:21-CV-01338-ADA, 2023 WL 353998, at *6 (W.D. Tex. 2023) (holding specific personal jurisdiction existed when the defendant, *inter alia*, "targets Texas residents, harvests their information . . ."). Standing alone, Arity 875's contacts with each individual Texan using the Arity SDK should establish minimum contacts to support specific jurisdiction in Texas.

### i. *Arity 875's data collection scheme purposefully availed it of Texas' jurisdiction.*

Arity 875 arranged to have the Arity SDK installed on mobile devices nationwide, including Texas devices, through the third-party mobile apps. Arity 875 collected data from Texans' devices and powered features on the devices' apps, such as crash detection and other services. Such contacts with Texans' devices were not "random, fortuitous, or attenuated," but rather the result of a comprehensive plan between Arity 875 and its co-defendants to install the Arity SDK on mobile devices across the country to gain access to driving data from those devices. *See Volkswagen*, 669 S.W.3d at 413–14. Finally, Arity 875 sought the benefit of access to Texans' data to supports its own business and services as well the business of its co-defendants.

In *Volkswagen*, defendants argued that because the software updates were coordinated out of state and affected vehicles nationwide—including Texas—it could not have purposefully availed itself of Texas' jurisdiction. *Volkswagen*, 669 S.W.3d at 405. The Texas Supreme Court rejected Volkswagen's argument because Volkswagen's conduct affected Texas equally as it did other states. *Id.* at 406 ("Personal jurisdiction is a forum-specific inquiry, and a defendant's contacts with other states do not negate purposeful availment of this jurisdiction regardless of whether out-of-state contacts are more, less, or exactly the same."). The Texas Supreme Court's holding in *Volkswagen* applies equally to Arity 875's conduct.

Here, Arity 875 purposefully availed itself of Texas' jurisdiction by installing software on devices nationwide, including Texas. Arity 875 dropped the software "down a chute guaranteed it would land in Texas." *See id.* at 432. Just as Volkswagen knew that tampered cars were in Texas due to each car's VIN, Arity 875 knew that its software was on Texas devices from the device id and geolocation data. *Id.* at 409. As Arity 875 freely admits, "its services are equally available in Texas as they are in all other States." Am. C.R. at 82, ¶ 12 (Decl. of Joy Thomas). But Arity 875 goes several steps further than in *Volkswagen,* by not only placing its software on Texans' devices, but also actively collecting sensitive information from those devices.

Modern smartphones contain a myriad of hardware and sensors that constantly monitor a device's physical geolocation (GPS, WiFi, Bluetooth), compass direction (magnetometer), speed (accelerometer), and physical orientation (gyroscope). *See* Am. C.R. at 215–16. Physical sensors on individuals' phones conduct these readings in Texas and reduce them to digital form, as if Arity 875 had placed a physical tracking device inside the phone to measure these actions. Because the Arity SDK coopts physical aspects of the device's hardware to obtain data, Arity 875 maintains a constant physical presence in Texas.

Unlike the discrete software updates in *Volkswagen,* Arity 875 maintained a continuous, multi-year relationship with millions of Texas consumers, collecting their data every fifteen seconds, amounting to billions of substantive contacts with Texas every day. Arity 875 then analyzed this data for use in advertising, for the benefit of the Allstate's family of insurance companies, and for sale to other insurers. Each of these invasive, personal contacts collecting individuals' private data could provide a basis for jurisdiction. Taken together, they demonstrate Arity 875's purposeful intent to collect this information for profit. Sometimes quantity has a quality all its own.

### ii. *Arity 875's jurisdictional contest lacks merit.*

Nonetheless, Arity 875 contests jurisdiction in Texas because Arity 875 does not specifically single out Texas and targets the entire nation. Am. C.R. at 67 (Arity 875 Sp. Ap.) ("Here, the challenged data collection affected Texans in the same way it did residents of all other States . . ."). In short, Arity 875 contends that because it does business everywhere, it can be sued nowhere, except a court in its home jurisdiction or of its own choosing.

But the Texas Supreme Court expressly rejected Arity 875's argument in *Volkswagen.* 669 S.W.3d at 406. In rejecting *Volkswagen*'s argument, the Texas Supreme Court stated, in relevant part, "[w]e also do not agree that the manufacturers' contacts were not purposefully directed at Texas simply because the same actions were also directed at other states." *Id.*; *see also BRP-Rotax GmbH & Co. KG v. Shaik*, No. 23–0756, slip op. at 18 (Tex. 2025) ("'direct[ing] activity to every state' is no less a targeting of Texas as to whatever activity occurred within Texas") (citing *Volkswagen*, 669 S.W.3d at 420). This Court should likewise reject Arity 875's argument here.

Even with the virtually identical facts from *Volkswagen* aside, Texas appellate courts have found specific jurisdiction with far less invasive and extensive technology than used by Arity 875 here. In *TravelJungle v. American Airlines, Inc.*,

the Fifth Court of Appeals upheld a trial court's decision to exercise specific jurisdiction where the defendant used a "screen-scraping software [that] sen[t] out electronic robots, spiders, or other automated scraping devices" to the plaintiff's computer servers. 212 S.W.3d 841, 847 (Tex. App.—Fort Worth 2006, no pet.)).

Using the screen-scraping software, the defendant initiated 2,972 fare search requests on plaintiff's website and, by extension, plaintiff's computer servers in Texas. *Id.* at 848. The defendant argued that because it was unaware of the location of the plaintiff's servers, the court should hold that the trial court lacked specific jurisdiction. *Id.* The court disagreed, holding that the defendant "should have been aware of the possibility that it would be haled into any forum where [the plaintiff's] servers were located." *Id.* at 851. Accordingly, the *TravelJungle* court upheld the trial court's finding that the defendant's contacts conferred the trial court specific jurisdiction. *Id.*

Arity 875's Texas contacts are more extensive than in *TravelJungle* both in substance and quantity. To an even greater extent than *TravelJungle*, Arity 875 maintained continuous active connections to millions of Texas mobile devices for several years, actively supplying crash detection and safety services, as well as scraping an immense amount of data. Arity 875 was entirely aware that its software would be installed on devices located within Texas, as demonstrated both by its own

38

declaration and the fact that Arity 875 collected mobile phones' Texas *location* information. *See* Am. C.R. at 82, ¶ 12 (Decl. of Joy Thomas).

Arity 875's contacts with Texas through the Arity SDK alone should be sufficient to find purposeful availment. Arity 875 does nothing to negate the State's allegations other than relying on arguments explicitly rejected by the Texas Supreme Court. This Court should conclude that personal jurisdiction exists based on this conduct alone.

### 3. Arity 875 availed itself of Texas by deliberately targeting Texans for marketing.

Arity 875 further purposefully availed itself of Texas by directing targeted advertisements to Texas users of the third-party mobile apps. When a non-resident business such as Arity 875 seeks to do extensive mass targeted advertising campaigns intending to serve the Texas market, that business purposefully avails itself of Texas' jurisdiction. *See Moki Mac*, 221 S.W.3d at 569, 576 ("A nonresident defendant that directs marketing efforts to Texas in the hope of soliciting sales is subject to suit here for alleged liability arising from or relating to that business."); *Facebook, Inc. v. Doe*, 650 S.W.3d 748, 757 (Tex. App.—Houston [14th Dist.] 2022, pet. denied) (holding, in relevant part, that Facebook purposefully availed itself of Texas' jurisdiction by "direct[ing] tailored advertisements to each Texas user . . .").

Using the data it collected, Arity 875 served up targeted advertisements in the mobile applications directed at Texans using the Arity SDK. Am. C.R. at 217–18, ¶ 43 (noting the Arity SDK "[t]arget[ed] drivers based on risk, mileage, commuting habits . . ."). Arity 875's advertising and marketing reach included "millions of drivers" including Texans. *Id.* In doing so, Arity 875 sought the benefit of marketing advertisements, including insurance advertisements, to Texans and within Texas' borders. As with *Volkswagen,* the fact that Arity 875 engaged in similar conduct nationwide does not render it immune to Texas' jurisdiction or "random, fortuitus, or attenuated." *See* 669 S.W.3d at 406, 414.

Courts examining the issue from other jurisdictions have likewise found targeted advertisement constitutes purposeful availment. *See, e.g.*, *UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 355 (4th Cir. 2020) (holding facilitating targeted advertising to residents of Virginia sufficient to grant personal jurisdiction over foreign individual operating a website); *Mavrix Photo, Inc. v. Brand Technologies, Inc.*, 647 F.3d 1218, 1230 (9th Cir. 2011) ("The fact that the advertisements targeted California residents indicates that Brand knows—either actually or constructively—about its California user base, and that it exploits that base for commercial gain by selling space on its website for advertisements."). Finding purposeful availment here

would be in line with a well-established nationwide understanding of personal jurisdiction as applied to targeted advertising.

In short, Arity 875's ample contacts permit this Court to exercise specific jurisdiction over it. Standing alone, each contact would be sufficient to convey personal jurisdiction. Together, Arity 875's contacts with Texas are beyond dispute, and Arity 875 did not and cannot negate the State's jurisdictional argument.

## B. Arity 875's Contacts Are "Substantially Related" to the State's Claims.

Arity 875's Texas contacts create the heart of the State's case. To satisfy the relatedness inquiry, there must be a "substantial connection" between a defendant's forum contacts and the operative facts of the litigation. *Moki Mac*, 221 S.W.3d at 584. To show "substantial connection," an "affiliation" must exist between the forum and the underlying controversy. *Volkswagen*, 669 S.W.3d at 430 (quoting *Bristol-Myers Squibb Co. v. Sup. Ct. of California, San Francisco Cnty.*, 582 U.S. 255, 262 (2017). Such an affiliation need not arise to "proof of causation," but merely show that litigation relates in some way to the defendant's forum contacts. *Id.* at 431.

The State's claims concern the unlawful collection and transfer of Texans' sensitive data by Arity 875 in violation of the TDPSA, the Texas Data Broker Act, and the Insurance Code as part of a common scheme between Arity 875 and its co-defendants to commit unfair insurance practices in Texas. As Texas courts have

repeatedly recognized, "the substantiality of the connection is 'enhanced' by Texas's strong interest in protecting its regulatory scheme . . ." *Volkswagen*, 669 S.W.3d at 432 (quoting *Moncrief Oil Int'l. Inc.*, 414 S.W.3d at 152). Arity 875's Texas contacts do not merely have a "substantial connection" to the State's claim—they are the State's claims.

Here, like in *Volkswagen*, Arity 875's "conduct took place in Texas, is subject to Texas' regulation under Texas law, and will form the 'focus of the trial.'" *Id.* Because Arity 875 harvests Texans' data without consent from Texas devices, the State alleges Arity 875 violates the Texas Data Privacy and Security Act and Texas Insurance Code. *See* Am. C.R. 224–26, 231.

Likewise, Arity 875's activities related to its contracts took place in Texas and will form the focus of trial. *See Volkswagen*, 669 S.W.3d at 432. Because Arity 875 contracted with Texas entities to harvest data without obtaining consent from Texas individuals, the State alleges Arity 875 violates the Texas Data Privacy and Security Act and the Texas Insurance Code. Am. C.R. at 226–28; Am. C.R. at 231.

The same applies to Arity 875's targeted advertising. Because Arity 875 targets insurance advertisements to Texans to support Allstate's unlawful insurance scheme, the State alleges Arity 875 violates the Texas Insurance Code by committing unfair practices in the business of insurance. Am. C.R. at 231, ¶ 95.

Finally, Arity 875's actions as an unregistered data broker relate to the State's claims for the same reasons. Because Arity 875 licenses personal data concerning Texas individuals without registering as a data broker, the State alleges Arity 875 violates the Texas Data Broker Act. Am. C.R. at 230–31, ¶ 88, 91. Arity 875's Texas contacts are the actions that give rise to its liability.

Contrary to what Arity 875 argued in the district court, this is not a "directed-a-tort" case. *Contra* Am. C.R. at 65–67. To avoid the "substantial connection" prong, Arity 875 divorced several cases concerning "directed-a-tort" theory from the relevant context to imply a rule that does not exist. *See* Am. C.R. at 65–67 (Arity 875 Sp. Ap.) (implying "directed-a-tort" theory may be applicable to negate personal jurisdiction); *see also Searcy*, 496 S.W.3d at 68–69; *Moncrief Oil*, 414 S.W.3d at 157; *Google LLC v. State*, No. 13-23-00114-CV, 2025 WL 52611, at *7 (Tex. App.—Corpus Christi–Edinburg Jan. 9, 2025). But Arity 875 misunderstood and misapplied the relevant rule.

*Searcy, Moncrief Oil,* and *Google* stand for the general contention that a tortfeasor's contacts with a forum must be related to an action brought by the State. *See, e.g.*, *Moncrief Oil,* 414 S.W.3d at 157 ("[A] non-resident directing a tort at Texas from afar is insufficient to confer specific jurisdiction."). Hence, personal jurisdiction based on a tort that was committed entirely out of state cannot logically

43

relate to the tortfeasor's contacts within the state—because the tort occurred out of the state. Using these cases, Arity 875 argued that because it *receives* data outside of Texas, the tort it committed occurred outside of Texas and therefore does not relate to its Texas contacts.

But Arity 875 is wrong both legally and factually. Here, Arity 875 has committed torts *within* the State of Texas—namely illegal data collection, licensing of data, and insurance practices—and its liability relates to Arity 875's conduct in Texas. Arity 875 further failed to account for its other contacts with Texas concerning advertising and contracting. The Arity SDK operates on phones and harvests data *within* Texas, sending that data to Arity 875 *outside* Texas. Arity 875 contracted with Texas companies. Arity 875 advertises to Texans. All these actions required Arity 875 to reach into the State of Texas from afar.

Even if Arity 875 could feasibly claim that the torts only become complete when it receives the data out-of-state, Arity 875's argument still fails. Arity 875 commits a necessary portion of the tort within Texas by placing the Arity SDK on the Texans' mobile phones and instructing the Arity SDK to send that data to Arity 875. The "directed-a-tort" theory from *Searcy, Moncrief Oil,* and *Google* is not applicable as the State's allegations are legally and factually distinct. This simply is not a "directed-a-tort" case.

Because Arity 875 did not and cannot negate the State's allegations that Arity 875 has minimum contacts with Texas, Arity 875 must demonstrate that "fair play and substantial justice" would render Texas' exercise of jurisdiction unreasonable. But Arity has not and cannot demonstrate such.

## II. TEXAS JURISDICTION DOES NOT OFFEND TRADITIONAL NOTIONS OF FAIR PLAY AND SUBSTANTIAL JUSTICE.

Finally, jurisdiction over Arity 875 does not offend notions of justice—it upholds them. Once it has been determined that a nonresident defendant purposefully established minimum contacts with the forum state, the contacts are then evaluated in light of other factors to determine whether assertion of personal jurisdiction comports with fair play and substantial justice. *Guardian Royal Exch. Assur., Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 228 (Tex. 1991). If a nonresident has minimum contacts with the state, then the exercise of jurisdiction will rarely offend traditional notions of fair play and substantial justice. *Moncrief,* 414 S.W.3d at 154–55. In making this determination a court generally looks to the following factors:

(1) The burden on the nonresident defendants;

(2) The interests of the forum state in adjudicating the dispute;

(3) The plaintiff's interest in obtaining convenient and effective relief;

45

(4) The interstate judicial system's interest in obtaining the most efficient resolution of controversies; and

(5) The shared interest of the several states in further substantive social policies.

*Guardian*, 815 S.W.2d at 228.

All factors cut in favor of the State. First, Arity 875 will not be unduly burdened by litigating in a Texas court. Arity 875 conducts business on a nationwide scale. Am. C.R. at 82, ¶ 12 (Decl. of Joy Thomas) (stating Arity's services are available in all states). As a company engaged in national operations and advertising as fully remote, Arity 875 cannot plausibly claim that appearing in a Texas court would impose an unfair burden merely because it has headquarters in Illinois. *See Spir Star v. Kimich*, 310 S.W.3d 868, 879 (Tex. 2010) (holding that distance alone is not sufficient to defeat jurisdiction). Texas courts have consistently held that modern transportation and communication significantly reduce the burden on nonresident defendants. *Id.* Furthermore, any burden on Arity 875 results entirely from its own actions in violation of Texas law. So, it can hardly be said that defending against its legal violations is an *undue* burden—rather, it is one completely justified in the law.

Second, Texas has a strong interest in adjudicating claims involving harm to Texas consumers caused by nonresident actors. *Moncrief*, 414 S.W.3d at 152 ("[I]t is beyond dispute that [a forum] has a significant interest in redressing injuries that occur within the State."). Texas courts have a well-established interest in protecting Texas consumers from unfair and deceptive conduct that is purposefully directed at the Texas marketplace. *See Moki Mac River Expeditions*, 221 S.W.3d at 575 (holding that when a nonresident purposefully avails itself of the privilege of conducting activities within the State, minimum contacts are sufficient). Further, issues of first impression such as the application of the Data Broker Act and the Texas Data Privacy and Security Act should be resolved by a court in Texas, not one in Illinois. *See Winnsboro Auto Ventures, LLC v. Santander Consumer USA, Inc.*, No. 05-17-00895-CV, 2018 WL 1870771, at *7 (Tex. App.—Dallas, Apr. 19, 2018, no pet.) ("Texas has an interest in adjudicating the dispute because the laws of Texas will apply to the contract's interpretation.").

Arity 875 installed data-collecting software on millions of Texas consumers' phones and in turn used that data in ways harmful to Texas consumers. While the effects of Arity 875's conduct may be national in scope, Texas' interest in protecting Texas consumers from Arity 875's conduct strongly favors maintaining jurisdiction over Arity 875.

47

Third, the State would have convenient and effective relief in Texas as opposed to another jurisdiction. *See Guardian*, 815 S.W.2d at 228. The State would be placed at a "severe disadvantage if [the State] were forced to follow [Arity 875] to a distant State in order to hold it legally accountable." *See id.* at 233 (quoting *McGee*, 355 U.S. at 223).

Fourth, the Texas Legislature's enactment of statutes governing data privacy demonstrates the State's interest in resolving this controversy. The Texas Data Privacy Security Act and the Texas Data Broker Act—statutes that form the basis of Plaintiff's claims against Arity 875—reflect Texas' effort to regulate the very type of conduct at issue in this case. Texas courts are indisputably better suited to protect Texans' privacy rights and interpret Texas privacy law than any other state courts.

Finally, exercising jurisdiction over Arity 875 also promotes juridical efficiency. Two of its related co-defendants, Arity Services, LLC and Arity, LLC, have not contested the trial court's exercise of personal jurisdiction, and therefore, the State's suit against them will proceed in Texas. Litigating all claims in one forum avoids duplicative proceedings and reduces the risk of inconsistent outcomes. *See Spir Star AG,* 310 S.W.3d at 879 ("[B]ecause the claims against [the resident defendant] will be heard in Texas, it would be more efficient to adjudicate the entire case in the same place."). By contrast, requiring a foreign court to hear the claims

48

solely as to Arity 875 would be both inefficient and burden the foreign court with the obligation to learn and apply Texas law. *Winnsboro Auto Ventures*, 2018 WL 1870771, at \*7. Trying Arity 875 in Texas will avoid duplication of efforts and serve the interests of judicial efficiency.

As such, this is not a "rare circumstance" in which the exercise of jurisdiction does not comport with fair play and substantial justice. *Spir Star*, 310 S.W.3d at 878. Therefore, we ask that this Court overturn the trial court's order granting Arity 875's special appearance.

## PRAYER

The Court should reverse the district court's order granting Arity 875's Special Appearance and remand for further proceedings.

Respectfully Submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for
Civil Litigation

JOHNATHAN STONE

Chief, Consumer Protection Division

## CERTIFICATE OF COMPLIANCE

Microsoft Word reports that this document contains 8,143 words, excluding exempted text.

/s/ Rick Berlin
RICK BERLIN

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Zeilic Contreras on behalf of Richard Berlin
Bar No. 24055161
zeilic.contreras@oag.texas.gov
Envelope ID: 102438604
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Brief for Appellant
Status as of 6/26/2025 7:03 AM CST

Associated Case Party: State of Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Rick Berlin | | Rick.Berlin@oag.texas.gov | 6/25/2025 5:05:07 PM | SENT |
| Daniel Zwart | | Daniel.Zwart@oag.texas.gov | 6/25/2025 5:05:07 PM | SENT |
| Kaylie Buettner | | Kaylie.Buettner@oag.texas.gov | 6/25/2025 5:05:07 PM | SENT |
| Zoann Willis | | zoann.willis@oag.texas.gov | 6/25/2025 5:05:07 PM | SENT |
| Meredith Spillane | | Meredith.Spillane@oag.texas.gov | 6/25/2025 5:05:07 PM | SENT |
| Zeilic Contreras | | Zeilic.Contreras@oag.texas.gov | 6/25/2025 5:05:07 PM | SENT |
| Carlos Fernandez | | Carlos.Fernandez@oag.texas.gov | 6/25/2025 5:05:07 PM | SENT |
| Madeline Fogel | | madeline.fogel@oag.texas.gov | 6/25/2025 5:05:07 PM | SENT |
| Richard RMcCutcheon | | richard.mccutcheon@oag.texas.gov | 6/25/2025 5:05:07 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| W. Reid Wittliff | | reid@wittliffcutter.com | 6/25/2025 5:05:07 PM | SENT |
| Jake Sommer | | jake@zwillgen.com | 6/25/2025 5:05:07 PM | SENT |
| Kelsey Harclerode | | kelsey@zwillgen.com | 6/25/2025 5:05:07 PM | SENT |
| Sudhir V. Rao | | sudhir.rao@zwillgen.com | 6/25/2025 5:05:07 PM | SENT |